## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____
)
**SUNITA JAYAKUMAR M.D.,**                    )
)
    **Plaintiff,**                    )  **CIVIL ACTION NO.** 2:20-cv-850
)
  **v.**                    )  **Electronically Filed**
)
**WELLPATH LLC,**                    )  **Jury Trial Demanded**
)
    **Defendant.**                    )
_____)

## <u>COMPLAINT</u>

### INTRODUCTION

1. In this employment discrimination action, a former employee charges that she was subjected to a sexually hostile work environment and retaliation by her immediate supervisor, and was constructively terminated upon the Defendant's continued inability to remediate the harassment.  Plaintiff alleges violations of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA").

### JURISDICTION AND VENUE

2. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(c)(2) because all Defendants are subject to personal jurisdiction in the Western District of Pennsylvania and the events herein occurred within this District.

### PARTIES

4. Plaintiff Sunita Jayakumar, M.D. (hereafter "Plaintiff" or "Dr. Jayakumar") is an adult female individual, a citizen of the United States, and at all times relevant hereto has been

a resident of the Commonwealth of Pennsylvania.  Plaintiff is a professional medical doctor and at all times relevant hereto was licensed to practice medicine in the Commonwealth of Pennsylvania.

5.      Defendant Wellpath LLC (hereafter "Wellpath") is a limited liability company based out of Tennessee, operating locally under the laws of the Commonwealth of Pennsylvania and doing business throughout Pennsylvania under the name Wellpath LLC.

6.      During the period of time referenced herein below, Defendant did operate and/or administer health and medical facilities located at prisons across the United States under the name Correct Care Solutions ("CCS").  On information and belief, CCS was rebranded as Wellpath LLC in 2019.

## FACTUAL ALLEGATIONS

7.      In the spring of 2017, Dr. Jayakumar responded to a solicitation for a part-time position as a physician at the State Correctional Institution located in Greene County, Pennsylvania.

8.      The solicitation for the aforementioned physician position was made by Robert Cross, a corporate recruiter for CCS.

9.      On May 19, 2017, Dr. Jayakumar received an offer of employment from Mr. Cross.

10.     Mr. Cross represented to Plaintiff that although the offer letter she received was headed "Midwest Center P.C." for reasons relating to malpractice insurance, she would "still be a CCS employee."

11.     On or about June 6, 2017, the Defendant was given documents to sign relating to CCS policies and manuals.  At that time, all of the documents, policies, and manuals provided to the Plaintiff indicated that, in accordance with Mr. Cross's representations to her, she

would be an employee of CCS and she would be subject to the CCS policies and procedures referred to therein.

12. Plaintiff began her employment at SCI Greene on or about June 12, 2017.

13. Plaintiff reported to a direct administrative supervisor named Michael Hice (hereafter "Hice" or "Supervisor Hice"), whose title was Health Services Administrator.  Clinically, Plaintiff reported to Dr. Denise Smyth, the facility's medical director.

14. After Supervisor Hice introduced Plaintiff to Dr. Smyth, Hice told the Plaintiff that he and Dr. Smyth were friends, and that Hice had helped Dr. Smyth get her current position (and that he had or would receive a $6,000 bonus for doing so).  Hice also advised the Plaintiff that he and Dr. Smyth would occasionally go to bars and restaurants together and that the two had local friends in common.

15. Plaintiff quickly noticed that Dr. Smyth was a curvy woman whose attire accentuated her figure, often wearing low-cut t-shirts, tight jeans and high heels to work at SCI Greene, an all-male prison.

16. Supervisor Hice reported directly to Marcy Duddy, regional manager for Defendant, based out of Lemoyne, Pennsylvania, several hundred miles away from Plaintiff near Harrisburg, PA.

17. Supervisor Hice was initially friendly with the Plaintiff and the two had a cordial but professional relationship.

18. The Plaintiff being a single mother, Hice advised the Plaintiff that because she was part-time, he was flexible about the time she worked as long as she put in at least the minimum hours required of her over the course of the week and saw all the patients she needed to see.  Hice maintained a similar flexibility with most policies and procedures

and was accommodating not only to Plaintiff, but most employees with whom he was friendly.

19.   Supervisor Hice was not only accommodating as far as flexibility with the rules for those he viewed as friendly, he often flaunted the authority that came with his position; for example, Hice advised Plaintiff that he often changed the time cards of employees who came in late or left early so that their time card displayed a full shift.

20.   Based upon Supervisor Hice's actions, Plaintiff quickly learned that if she was going to keep her employment with Defendant and stay on good terms there, she had to make sure to stay in Hice's good graces and not end up on bad terms with him.

21.   Plaintiff was advised when she began her employment that she would be on a probationary period of ninety (90) days.

22.   Plaintiff was advised also when she started her employment that she would be given a full-day self-defense class in the event of being attacked by an inmate.

23.   Shortly after she began her employment, Supervisor Hice became flirtatious with the Plaintiff and began attempting to become more than professional acquaintances, for example asking Plaintiff questions about her personal, social and/or romantic life.

24.   Not long into her employment, while alone with Supervisor Hice, Hice reached toward the Plaintiff, and grabbed the Plaintiff's breast through the collar of her shirt.

25.   Plaintiff immediately objected to the touching and asked Supervisor Hice not to touch her again; Hice claimed it was an accident, and apologized.

26.   Giving Hice the benefit of the doubt as to the incidental nature of the contact, and believing that her objection and his apology was enough to settle the issue, Plaintiff did not immediately report the touching because the incident happened while she was still on

her probationary period and she did not want any possible negative ramifications.

27.   What initially seemed like flexibility to the Plaintiff was indicative of Supervisor Hice's lack of appropriate professional boundaries.  By way of example, shortly after Plaintiff began working at SCI Greene, Supervisor Hice demanded that Plaintiff give him her Drug Enforcement Agency (DEA) Identification Number so that he could order narcotics and other drugs for the facility under her name.  Not being the medical director and having little oversight as to whom those drugs were given or where they would end up, Plaintiff had reservations about giving Hice her DEA number, but was afraid to refuse his requests.  Requests for the Plaintiff's DEA number for this purpose happened often throughout Plaintiff's employment.

28.   Also not long after Plaintiff started, Hice began complaining and/or commenting about the way Plaintiff dressed to work.  Unlike Dr. Smyth, who regularly wore revealing clothing to work, Plaintiff wore scrubs to work every day.  Hice would often encourage the Plaintiff to dress more scantily like Dr. Smyth and tell her to stop wearing scrubs.

29.   Over the course of the summer and into the fall of 2017, Supervisor Hice continued his attempts to become more personal with the Plaintiff, for example asking if she would add him as a friend on social media site, Facebook. Plaintiff was uncomfortable with this request; however, hesitant to tell her supervisor that she refused to be his friend online, she acquiesced.

30.   Supervisor Hice had access to the Plaintiff's cell phone number through work, and began texting the Plaintiff – both about work and otherwise, and often late at night.

31.   Despite Plaintiff's reluctance, Plaintiff engaged Hice via text because there were work-related occasions where texting made communication easier.

5

32.   During Hice's communication with Plaintiff, Hice repeatedly asked Plaintiff to send him photographs of her.  If Plaintiff would send him fully-clothed, appropriate pictures (such as with her family), Hice would reply with comments such as: "U look hot as hell" or "Freakin hottttttt".

33.   While at work, Plaintiff began hearing from other employees that Supervisor Hice would make statements that he intended to sleep with her, or other statements about her romantic life and appearance.

34.   Sex-based rumors about her coming from her supervisor, and statements about his intention to sleep with her, made Plaintiff uncomfortable and disgusted. Plaintiff was concerned and believed that Supervisor Hice had the wrong impression about their relationship, but did not want to allow an uncomfortable confrontation with her supervisor to jeopardize her employment or make Supervisor Hice hostile towards her.

35.   Plaintiff was frustrated with the impression Hice was giving her coworkers by his statements, but in fall of 2017, Plaintiff began dating the son of another coworker.

36.   Word soon spread among her coworkers that Plaintiff was dating someone; Plaintiff hoped that this information made it clear to Supervisor Hice that she was not interested in him romantically without her having to potentially worsen the situation by formally complaining.

37.   Unfortunately for Plaintiff, once Supervisor Hice learned that she began dating someone and that his ongoing advances were spurned, his attitude toward the Plaintiff immediately and negatively changed.

38.   After learning of Plaintiff's new relationship, Supervisor Hice changed policies and stripped the Plaintiff of dedicated use of office space for typing notes and reports.

39.   Hice began commenting negatively about the Plaintiff's new relationship, and now began making derogatory statements about the Plaintiff herself, including her appearance and her personality.

40.   As the Plaintiff's romantic relationship with the coworkers' son continued into 2018, Hice became increasingly antagonistic towards the Plaintiff, both verbally and with regard to the administrative tasks of her employment.

41.   By way of example, Hice began assigning Plaintiff more patients to see in a day than other physicians; Hice would also assign Plaintiff to see more patients than her part-time schedule would permit.

42.   As this is a state correctional facility housing serious criminals, many patients are violent criminals with a history of abusive behavior or contact with women.  While normally this was permissible only in extraordinary circumstances, in early 2018, Hice began assigning Plaintiff to see patients whose files were designated such that they should not see female physicians.  On occasion, despite knowing that Plaintiff had not had the self-defense course all other physicians had been given, Supervisor Hice would demand that Plaintiff see such patients without a guard-chaperone for her personal safety.

43.   As Supervisor Hice's hostility toward the Plaintiff increased, her access to the resources she needed to perform her duties was eroded.  Plaintiff repeatedly had to request access for things like x-ray films or commissary item lists, while no other physicians were required to do so.

44.   By this point in her employment, Plaintiff had observed that whereas Supervisor Hice treated those he was friends with well and those he did not like poorly, other employees acted in concert with Supervisor Hice with regard to treatment (or mistreatment) of those

employees whom Supervisor Hice did not like.

45. In accord with the above, other employees with whom Supervisor Hice was allied would also engage in harassment of the Plaintiff.

46. By way of example, although Plaintiff no longer had dedicated office space, Supervisor Hice assigned Plaintiff to work out of office number eight to complete reports and paperwork.  Plaintiff had many issues with her assignment to this office.  For example, on one occasion, the keyboard in office number eight was replaced with a filthy keyboard covered in dirt and dust, despite just the day before the office had a working keyboard which the Plaintiff had cleaned.  On other occasions, the computer mouse was missing.

47. Plaintiff would often report to work and attempt to use her assigned office, but would find that it was occupied with other individuals with little or no business in said office, or who had their own dedicated office space elsewhere but used this office specifically to render the Plaintiff unable to complete her paperwork or reports.

48. The SCI Greene facility has a dedicated parking spot for physicians; however, Supervisor Hice regularly allowed non-physician employees to park in said spot on days when the Plaintiff would work.  When Plaintiff would voice her complaints, Supervisor Hice would laugh at her and tell her she had to share the spot with non-physicians.   Other physicians had no problem accessing the designated parking spot.

49. Many of these employees who also engaged in mistreatment of the Plaintiff are individuals whom the Plaintiff had seen or knew to have received favors or favorable treatment from Supervisor Hice, such as having their time cards amended, or allowing other policy deviations.

50. Beginning in early 2018, Supervisor Hice began keeping tabs on the Plaintiff online.

8

Hice would contact the Plaintiff via Facebook late in the evening and ask her why she was online when she had to work the next day, or would message her in such a way as to let her know he was watching her.

51. Supervisor Hice's online stalking of the Plaintiff eventually led to Plaintiff having to block Supervisor Hice from contacting her via social media.

52. Supervisor Hice went from casual antagonism of the Plaintiff to open hostility by the end of 2018.

53. By fall of 2018, Supervisor Hice was assigning Plaintiff to perform duties no other physician had to perform, including duties otherwise performed by registered nurses (RNs), such as pre-health assessments.

54. Despite not being the facility's medical director and not being a physician himself, Supervisor Hice would often sit in on Plaintiff's visits with patients and critique the Plaintiff in front of patient-inmates.

55. No other physician at SCI Greene had to endure Supervisor Hice sitting in on their patient visits and receiving critiques on bedside manner from a non-physician.

56. Plaintiff repeatedly contacted Regional Manager Duddy and advised her verbally of the aforementioned treatment of the Plaintiff by Supervisor Hice; although she did not initially tell Regional Manager Duddy about the inappropriate touching at the start of her employment, she did detail that she was hearing about Hice's statements about her appearance, the statements about his intention to sleep with her, and all of the actions Supervisor Hice had taken since 2017 which she felt were in retaliation for Plaintiff's refusal to become romantically involved with Hice.

57. Regional Manager Duddy did not take Plaintiff's repeated complaints seriously and

declined to initiate any investigation or take any action to retrain Supervisor Hice on appropriate relations with those he supervised, or to enact any discipline against Hice whatsoever; rather, every time Plaintiff complained to Duddy, then unbeknownst to Plaintiff, Duddy immediately contacted Hice and advised him that Plaintiff was lodging complaints about him.

58. On information and belief, Plaintiff is not the first female employee to complain of inappropriate language, disrespect, and gender-based hostility from Supervisor Hice at SCI Greene.

59. Plaintiff believes and therefore avers that Regional Manager Duddy knew or should have known of Hice's history of mistreating female employees.

60. Plaintiff began to suspect that her complaints to Regional Manager Duddy were being forwarded directly to Supervisor Hice rather than being investigated because, within days or sometimes hours, Supervisor Hice would tell Plaintiff that he knew she was complaining about him. Each time she lodged a complaint with Duddy, Supervisor Hice's antagonism would worsen.

61. By the fall of 2018, the Plaintiff was inundated with more patients than any other physician at the facility, despite being only a part-time employee. Combined with the intentional difficulty in accessing her office, Supervisor Hice's intentional inflation of the Plaintiff's patient count made it difficult if not impossible for the Plaintiff to keep up with her reporting and paperwork obligations.

62. Plaintiff was subject to scrutiny no other physician was, due to Hice's open hostility towards her, all relating back to Plaintiff's unwillingness to engage Hice in a romantic relationship. Other physicians would have delays in filling out reports and notes on

encounters with patients which would slow or delay the Plaintiff's ability to draft her own reports or notes; however, only Plaintiff was blamed for the lack of timely reports.

63.   Plaintiff was also the only physician at the facility who was not given the full-day self-defense class, despite repeatedly asking Hice to schedule her for it, and despite Hice having lied to the Commonwealth of Pennsylvania auditors/inspectors that she had.

64.   Hice's preferential treatment toward Dr. Smyth, given her flirtatious relationship with him and her affinity for wearing the type of revealing clothing Hice preferred, also meant that Hice allowed Dr. Smyth to avoid many of her typical duties, instead requiring Plaintiff to perform them.  For example, Dr. Smyth would often report to work in the middle of the night when patients were sleeping so as to avoid treating the patient "lines" (daily lists of patients with complaints requesting to see doctors) which are typically seen by the facility's medical director.  Dr. Smyth was not required to see infirmary patients or to do rounds and would refuse to see triage patients; Plaintiff was required to do these things in her part-time capacity in addition to her normal tasks, inundating her with work that was specifically and/or contractually the duty of other physicians or staff.   In short, Plaintiff had to do Dr. Smyth's job as well as her own much of the time, all because Hice favored Dr. Smyth and her acquiescence to his flirtatiousness and innuendo.

65.   Whereas Plaintiff's position was part time and Plaintiff anticipated when she took the position that she would be scheduled for three days per week, given her vastly expanded duties, Plaintiff was required to work far more than anticipated because of Hice allowing Dr. Smyth to avoid her duties.  On one occasion, for example, Plaintiff was required to spend an entire shift testifying in the facility's courtroom relating to a patient she had never seen, that she had never treated and whom she had never signed any orders for, all

because Dr. Smyth did not come to work.  When Plaintiff was unable to finish her charts or orders because she was required to fill in for Dr. Smyth, Plaintiff was required to go back to work from 10:30PM to 2:30AM to see all of the infirmary patients and finish her charts.

66.    In the fall of 2018, Plaintiff also repeatedly had her personal locker broken into, resulting in missing medications.  As Plaintiff also stored her personal belongings in this locker, Plaintiff could no longer keep personal items at the facility.

67.    In sum, by the fall of 2018, Supervisor Hice was using his administrative duties to intentionally set up the Plaintiff for failure, or to otherwise make it appear as though she was failing at her job.

68.    Specifically, although a year prior he was flexible with regard to start and end times and would even amend peoples' time cards to reflect their full shift, Supervisor Hice became particularly strict about Plaintiff starting promptly at 8:00AM.  Knowing that Plaintiff had a young child she had to take to school at a specific time and that a strict start time would be a hardship for the Plaintiff after becoming accustomed to the flexibility, Supervisor Hice began targeting the Plaintiff and singling her out for discipline relating to her purported tardiness.

69.    Hice was also friendly with many of the guards at the facility.  To support his singling-out and setting up the Plaintiff for failure, Hice would tell the guards with whom he was friends to intentionally delay the Plaintiff during the fifteen-minute, two-step security pass points which she had to pass through **prior** to being able to clock in.  The guards would make DVD videos of the Plaintiff being frustrated by her occupied parking space or delays getting through security, then give those videos to Hice for him to watch and

12

laugh.  On at least one occasion, Hice showed said videos to Plaintiff and laughed at her.

70.   Hice would often use or allow other staff-allies at the facility to belittle, bully, or usurp the Plaintiff or her role.  By way of example, one patient at the facility had a jaw fracture and Hice told Plaintiff to get liquid ibuprofen at Wal-Mart during her unpaid lunch break, but intentionally did not tell the guards that he had asked her to acquire said medicine. The guards stopped the Plaintiff, delaying her return to work, subjecting her to investigation for attempting to bring in the ibuprofen her supervisor demanded she acquire.

71.   On November 5, 2018, Supervisor Hice emailed the Plaintiff demanding that she abide by her start time of 8:00AM, and claiming that if the tardiness continued he would take disciplinary action; only one week later, Hice drafted a written disciplinary action form reprimanding the Plaintiff for allegedly being tardy ten (10) times **prior** to the warning.

72.   On information and belief, no other employees received a written disciplinary action form submission for tardiness occurring prior to the warning from Supervisor Hice.

73.   The Plaintiff being a part-time employee and having been  advised at the start of her employment that the specific hours she worked were less important than satisfying the quantity of hours needed, the Plaintiff regularly worked past her 2:30PM end time and satisfied the hourly requirement of her position.

74.   Despite satisfying the hourly requirement of her part-time position, and despite staying past her designated end time in order to fulfill her duties, Supervisor Hice continued to demand the Plaintiff report at 8:00AM and refused to allow her to amend her start time.

75.   By this point, any communication between the Plaintiff and Supervisor Hice was vitriolic, with Hice talking down to the Plaintiff, belittling her in front of coworkers, and

Hice doing everything in his power to undermine and demoralize the Plaintiff.

76. In late December 2018, Supervisor Hice stopped scheduling nurses to work at the same time as the Plaintiff, requiring the Plaintiff to perform duties otherwise assigned to nurses, such as "periodic preventative health assessments", taking patients' vital measurements, temperature, blood pressure, pulse, respiration, blood oxygen levels, weight, and other tasks typically assigned to support staff.

77. On information and belief, no other physician had to work exclusively without the assistance of a registered nurse for any extended period.

78. Requiring Plaintiff to perform her duties without the benefit of a nurse further set Plaintiff up for failure by ensuring she had little or no extra time to both see all the patients necessary and complete the requisite paperwork for said patients, which included her own patients but often patients who should otherwise have been seen by Dr. Smyth or other physicians at the facility.

79. On January 17, 2019, the Plaintiff contacted Regional Manager Duddy and stated: "Please call me today.  I need to speak to you and inform you of several things.  Please call me on my personal cell phone, or leave me a number that I can call you on my way home."

80. In the ensuing telephone call, Plaintiff specifically advised Regional Manager Duddy of everything which had occurred up through that time, beginning with the "incidental" touching of her breast, through the statements Hice made about her appearance and his intent to sleep with her, the repeated late-night communications via Facebook and text, and the open and increasing hostility directed at her by Hice over the past year after she had spurned his romantic ideations.

14

81.   Plaintiff was reluctant to explicitly relate all of the aforementioned harassment to Regional Manager Duddy because each time in the past she had attempted to confide in Duddy, the Plaintiff's complaints were immediately relayed to Supervisor Hice, who would then angrily tell the Plaintiff that he knew she was complaining about him and "double down" on the belittling and antagonism of the Plaintiff.

82.   The day after Plaintiff related the ongoing harassment to Regional Manager Duddy, Duddy emailed Supervisor Hice and others advising that she was scheduling a staff meeting for January 22, 2019, the next day that Plaintiff was scheduled to work.

83.   Plaintiff believes and therefore avers that Regional Manager Duddy did relate to Supervisor Hice that Plaintiff had told her about the ongoing harassment, because when Plaintiff reported to work on January 22, Supervisor Hice had another disciplinary action reporting form drafted.  This form claimed that the Plaintiff had been tardy "no less than 21 days" since December 1, 2018.

84.   On information and belief, Supervisor Hice had modified the time Plaintiff reported to work on at least some of the days he claimed Plaintiff was tardy on the January 22, 2019, disciplinary action form.

85.   On information and belief, several of the days Hice claims Plaintiff reported late were discussed with and approved in advance by Hice

86.   Although Plaintiff told Duddy on January 17, 2019, as well as on repeated occasions in the past, that she was afraid of retaliation by Supervisor Hice, Duddy did sign the disciplinary action form drafted by Supervisor Hice.

87.   After the January 22, 2019, disciplinary action taken, and in retaliation for Plaintiff having complained again to Regional Manager Duddy, Supervisor Hice began requiring

Plaintiff to clock in and clock out at lunch in addition to when she arrived and departed for the day.

88.     On January 24, 2019, Plaintiff emailed Regional Manager Duddy and complained additionally of various issues, including the lack of support staff, being overburdened with work otherwise assigned to that support staff, and difficulty accessing her assigned office.  She advised that she feared retaliation and that she had been retaliated against in the past.  She also advised that she had addressed all of these issues with Supervisor Hice and that he is "fully aware."

89.     Regional Manager Duddy responded to the Plaintiff's complaints on January 27, 2019, by copying Supervisor Hice on her response and telling the Plaintiff that she needs to "communicate these issues with Mike"; however, as Plaintiff repeatedly told Duddy prior to this email and as she reiterated multiple times thereafter, Plaintiff believed Supervisor Hice was intentionally precipitating all of these issues himself.

90.     Indeed, like all of the Plaintiff's prior complaints about Supervisor Hice and the conditions working under him at SCI Greene, Regional Manager Duddy forwarded the complaint about Supervisor Hice directly to Supervisor Hice.

91.     Supervisor Hice continuing to deny the Plaintiff's verbal requests to move her start time back to avoid tardiness, given the newly-strict enforcement of Plaintiff's start times, on February 11, 2019, Hice drafted another disciplinary action form relating to three days on which Hice claimed Plaintiff was tardy and noted that it was a "final warning".

92.     Despite emailing Regional Manager Duddy on both January 24th and January 28th that she anticipated retaliation from Hice, Duddy did sign the February 11, 2019, disciplinary action form without inquiring with Plaintiff as to whether she felt this action was

retaliatory.

93.   After receiving the written discipline on February 11, 2019, Plaintiff began reporting to work prior to 8:00AM just to ensure that she was not late and that Supervisor Hice could not further retaliate against her by fabricating tardiness on her time cards.

94.   On information and belief, no other physician had to report to work prior to their scheduled time in order to avoid discipline from Supervisor Hice.

95.   On information and belief, many other employees under Supervisor Hice (including physicians) reported to work at times after their scheduled start time without reprimand from Supervisor Hice.

96.   On information and belief, the reason Supervisor Hice singled Plaintiff out for reprimand for tardiness was resentment and hostility towards her for having declined his romantic intentions.

97.   Despite his ongoing torment of the Plaintiff and his ongoing attempts to enact discipline against her, Supervisor Hice continued to demand Plaintiff allow him to use her DEA number to order narcotics, with no explanation as to which patients were to receive the drugs or what was otherwise to be done with them.

98.   Between February and May 2019, it being clear to Plaintiff that Regional Manager Duddy would not or could not take action to curtail Supervisor Hice's antagonism stemming from her having rejected his advances, Plaintiff avoided contact with Supervisor Hice as much as possible.

99.   Although Plaintiff did attempt to avoid Supervisor Hice whenever possible, communication with her supervisor was a necessary component of her job; Plaintiff was subject to belittling, sarcastic, and denigrating language from Supervisor Hice any time

she had to interact with him.  Such vitriol from Hice toward the Plaintiff occurred in
private but in front of other coworkers and patients as well.

100.   During this same period, Supervisor Hice continued to intentionally assign Plaintiff to see
inmate-patients who were specifically designated not to see female physicians, despite
Plaintiff having never been given the self-defense training other physicians had received.
Frequently, Plaintiff was forced by Supervisor Hice to see these often-dangerous patients
without any guard or chaperone, putting her in direct risk of harm, and at serious,
substantial risk of sexual assault.

101.   On May 9, 2019, Supervisor Hice demanded Plaintiff see a patient who was otherwise
not to see female physicians where said patient was unaccompanied by a guard.

102.   At that time, Plaintiff objected verbally to seeing an unaccompanied inmate who was a
threat to female physicians, and a confrontation ensued between Plaintiff and Supervisor
Hice wherein Plaintiff told Hice that she was tired of the constant abuse and mistreatment
because she refused to date him or engage with him flirtatiously.

103.   During this confrontation, Supervisor Hice became irate, physically and verbally
aggressive and threatening, and began shouting at Plaintiff in front of staff and inmates.

104.   On May 9, 2019, Plaintiff was forced to resign her position at SCI Greene by way of an
email to Regional Manager Duddy wherein Plaintiff specifically stated that she was
resigning due "to the hostile work environment caused by the continued abuse,
harassment, and bullying of Michael Hice".  Plaintiff's email noted that she reported the
behavior several times, that she was subject to harassment, and that the behavior had
escalated.  Her email advised that she was fearful for her safety and wellbeing.

105.   Plaintiff received no response to her email, nor any follow-up from Defendant.

106.   In June 2019, CNN issued an investigative report on CCS[1] wherein the authors
determined that "amid a focus on 'cost containment' and massive corporate growth, the
company has provided substandard care that has led to deaths and other serious outcomes
that could have been avoided", and that interviews with current and former employees
reveal that "workers are disciplined or fired for raising concerns".

107.   The CNN article details former employees who complained of mistreatment and
mismanagement by supervisors and who were ultimately fired, with CCS alleging they
were fired for a "vague attendance issue".

108.   Plaintiff believes and therefore avers that Supervisor Hice was concocting a similar
"attendance issue" in her file for purposes of ultimately terminating her, had she not been
forced to resign before Supervisor Hice could artificially justify doing so.

109.   In response to the CNN article, Defendant issued a statement wherein it claimed that "[i]n
jails, our work is akin to working in an ER, where we have limited time with patients
who are often experiencing one of the worst moments of their lives."[2]

110.   However, when Plaintiff complained to Regional Manager Duddy about Supervisor Hice,
Hice would regularly and repeatedly claim to Duddy that Hice's problem with Plaintiff
was with her spending too much time with patients.  Indeed, Hice justified his singling
out of Plaintiff to sit in on her patient visits by claiming she spent too much time with
patients.

111.   On information and belief, Supervisor Hice was appealing to an unethical, immoral
corporate policy of spending as little time with patients as possible in order to maximize

---

[1] Blake Ellis and Melanie Hicken, *CNN investigation exposes preventable deaths and dangerous care in jails and prisons across the country*, CNN, https://www.cnn.com/interactive/2019/06/us/jail-health-care-ccs-invs/ (last visited May 22, 2020).
[2] *Wellpath Statement*, https://assets.documentcloud.org/documents/6165071/Wellpath-Statements.pdf (last accessed May 11, 2020).

profits as a way of obfuscating his real motive: retaliating against and getting back at the Plaintiff for refusing him romantically.

112.    On information and belief, Regional Manager Duddy and Defendant elected to believe Supervisor Hice's ersatz complaints about the Plaintiff and her purported failure to see the requisite number of patients, and allowed Supervisor Hice to assail, harass, oppress, belittle and humiliate the Plaintiff in the interest of furthering the aforementioned corporate policies.

113.    Whereas Plaintiff was providing patients with the customary standard of care that should be provided to all patients treated by Defendant and spending the time necessary with the patients to ascertain their medical needs, Supervisor Hice was utilizing corporate policy which undermines that standard of care as a tool to attack and besmirch the Plaintiff's quality of practice as a pretext for having her fired.

114.    On or about August 2, 2019, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission against Defendant, docketed at EEOC Nos. 533-2019-01977 and 533-2019-01978.

115.    On or about March 9, 2020, Plaintiff did receive a Dismissal and Notice of Rights from the EEOC, authorizing the within action.  Exhibit 1.

## COUNT I

### JAYAKUMAR V. WELLPATH LLC

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e-2, *et seq.*) & PENNSYLVANIA HUMAN RELATIONS ACT (43 P.S. §§ 951, *et seq.*)**

### HOSTILE WORK ENVIRONMENT

116.    Paragraphs one (1) through one hundred and fifteen (115) are hereby incorporated by reference as if set forth fully herein.

117.   Defendant is an employer within the definition of 42 U.S.C. § 12111(5) and 43 P.S. 954(b) .

118.   Whereas Plaintiff was assured at the time of her hire that she would be an employee of Defendant, all substantive paperwork relating to her employment was created and kept by Defendant, the Plaintiff's job description and duties were created by Defendant, all of policies and procedures relating to the job were Defendant's policies, all disciplinary forms refer to Plaintiff as Defendant's employee, and where Defendant specified the time, location, function, terms, responsibilities, and obligations of Plaintiff in the performance of her role, Plaintiff was an employee of Defendant.

119.   Plaintiff is a member of a class protected in her employment on the basis of her female sex as contemplated by Title VII and the PHRA.

120.   Plaintiff suffered intentional harassment, discrimination, and a sexually hostile work environment by the words and acts of Supervisor Hice on the basis of her female sex in that she refused her supervisor's romantic advances and/or intentions.

121.   The discrimination Plaintiff suffered at the hands of Supervisor Hice was pervasive, regular, and severe.

122.   The discrimination Plaintiff suffered at the hands of Supervisor Hice detrimentally affected the Plaintiff.

123.   The discrimination Plaintiff suffered at the hands of Supervisor Hice would detrimentally affect a reasonable woman in the same position as the Plaintiff.

124.   The treatment to which Plaintiff was subjected caused Plaintiff extreme emotional distress, humiliation, psychological trauma, physical distress, mental anxiety and anguish, along with tangible economic damages.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendant, awarding the Plaintiff back pay, front pay, damages for loss of employment and/or economic opportunity, loss of quality of life, embarrassment, humiliation and extreme physical and emotional distress, along with reasonable attorneys' fees and costs, as well as any other such relief as this Court deems fit or otherwise authorized at law.

## COUNT II

### JAYAKUMAR V. WELLPATH LLC

### TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e-2, *et seq.*) & PENNSYLVANIA HUMAN RELATIONS ACT (43 P.S. §§ 951, *et seq.*)

### CONSTRUCTIVE DISCHARGE

125. Paragraphs one (1) through one hundred and twenty-four (124) are hereby incorporated by reference as if set forth fully herein.

126. The words and acts of Plaintiff's supervisor, the inaction of Regional Manager Duddy after being advised of said supervisor's conduct and/or relating those complaints back to Supervisor Hice, the continued harassment, belittling and antagonism of Plaintiff, and the unwillingness of Defendant to install effective grievance procedures or reprimand those engaging in harassment and retaliation, all created working conditions so intolerable that Plaintiff was forced to resign her position.

127. Despite advising Regional Manager Duddy that she perceived a high likelihood of retaliation after complaining of Supervisor Hice, Defendant took no preventative measures to ensure that such retaliation did not occur or to ensure that Plaintiff knew the appropriate procedures to report such retaliation should it occur in order to curtail it promptly and effectively.

128. Defendant knew or should have known of an ongoing pattern of sexual harassment and/or

sex-based hostility toward the Plaintiff, which it did nothing to stop.

129.    Plaintiff's resignation, given the totality of the circumstances, was both objectively and

        subjectively reasonable because, facing the facts alleged herein, a reasonable person

        would reach their breaking point and would be compelled to resign.

130.    The constructive discharge of Plaintiff has caused the Plaintiff ascertainable economic

        and non-economic damages.

        WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment

in her favor and against Defendant for the constructive discharge of Plaintiff, awarding the

Plaintiff back pay, front pay, damages for loss of employment and/or economic opportunity, loss

of quality of life, embarrassment, humiliation and extreme physical and emotional distress, along

with reasonable attorneys' fees and costs, as well as any other such relief as this Court deems fit

or otherwise authorized at law.

### COUNT III

### JAYAKUMAR V. WELLPATH LLC

**TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. § 2000e-2, *et seq.*) &
PENNSYLVANIA HUMAN RELATIONS ACT (43 P.S. §§ 951, *et seq.*)**

### RETALIATION

131.    Paragraphs one (1) through one hundred and thirty (130) are hereby incorporated by

        reference as if set forth fully herein.

132.    Plaintiff repeatedly reported the harassing, belittling, demeaning, and abusive statements

        by Supervisor Hice to Regional Manager Duddy, including her suspicion that such

        mistreatment was caused by her having spurned Hice's romantic advances.

133.    Defendant's "Harassment Policy" specifically provides that "allegations of harassment of

        any kind of any kind must be reported to Human Resources **or any member of**

**management"**.

134.    Marcy Duddy, as a regional manager and Hice's supervisor, is a member of management specifically appointed by Defendant to receive reports of harassment per Defendant's policy.

135.    Reporting harassment and the belief that it related to the rejection of a romantic relationship is activity protected by Title VII and the PHRA.

136.    Plaintiff reporting harassment by her supervisor to Regional Manager Duddy was in compliance with Defendant's Harassment Policy.

137.    Plaintiff reporting harassment by Supervisor Hice to Regional Manager Duddy was activity protected from retaliation by Title VII and the PHRA.

138.    Regional Manager Duddy immediately, or soon after receiving them, forwarded or related Plaintiff's complaints to Supervisor Hice, of whom Plaintiff was complaining.

139.    Upon learning of Plaintiff's complaints, Supervisor Hice took contemporaneous adverse actions against the Plaintiff, including but not limited to: writing her up for tardiness and/or manipulating her time records; requiring she clock in and out at times other employees did not; verbally abusing or harassing Plaintiff for having complained about him; putting Plaintiff in physically dangerous situations with inmates; allowing other employees or individuals to mistreat the Plaintiff; and denying her resources typical of her position (parking space, dedicated office space, theft of keyboard/mice, et cetera).

140.    Forwarding Plaintiff's complaints to the individual of whom she was complaining empowered Supervisor Hice to continue his campaign of harassment and bullying, exacerbated Plaintiff's feelings of hopelessness and humiliation, and enabled Supervisor Hice to continue to mistreat the Plaintiff unabated.

24

141. Supervisor Hice, as an individual empowered by Defendant with administrative tasks and functions, had the ability and authority given him by Defendant to take retaliatory actions against the Plaintiff after learning of her complaints against him.

142. Regional Manager Duddy, had the ability and authority to investigate the Plaintiff's concerns of retaliation and mistreatment by Supervisor Hice, but instead Duddy signed off on the discipline fabricated by Supervisor Hice despite the concerns of retaliation specifically voiced by Plaintiff, enabling the worsening retaliation Plaintiff suffered.

143. Upon learning of each of the Plaintiff's complaints against him, the Defendant, via Supervisor Hice, did retaliate against the Plaintiff for each one of said complaints, ultimately culminating in her forced resignation.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in her favor and against Defendant for retaliating against the Plaintiff for engaging in protected activity, awarding the Plaintiff back pay, front pay, damages for loss of employment and/or economic opportunity, loss of quality of life, embarrassment, humiliation and extreme physical and emotional distress, along with reasonable attorneys' fees and costs, as well as any other such relief as this Court deems fit or otherwise authorized at law.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues contained herein.

Respectfully submitted:

By:     /s/ Devin C. O'Leary
        Devin C. O'Leary, Esq.
        Pa.I.D. No. 312544
        DOLeary@smalawgroup.com
        STEWART, MURRAY & ASSOCIATES
        114 Smithfield Street
        Pittsburgh, PA 15222
        412-765-3345